UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Gordon Woods

     v.

WestBridge Incorporated, Steven Berry,
Stacie Lucius, Kevin Keefe,
and Phillip Cole

Civil No. 1:24-cv-027-SE-TSM
Opinion No. 2026 DNH 034

O R D E R

Plaintiff Gordon Woods filed an amended complaint alleging, in large part, employment discrimination on the basis of his Irish national origin, race, ethnicity, and ancestry. He claims: (1) discrimination in violation of Title VII; (2) hostile work environment in violation of Title VII; (3) retaliation in violation of Title VII; (4) race discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; (5) retaliation in violation of § 1981; and (6) hostile work environment in violation of § 1981. He names as defendants his former employer, WestBridge Incorporated, and four current or former WestBridge employees, Steven Berry, Stacie Lucius, Kevin Keefe, and Phillip Cole.

WestBridge, Berry, and Lucius (WestBridge defendants) move to dismiss the amended complaint in its entirety. Doc. no. 34. Keefe and Cole separately move to dismiss Counts IV and V of the amended complaint. Doc. no. 32. Keefe and Cole also move to join their co-defendants' motion to dismiss with their assent. Doc. no. 37. In addition, Woods moves to strike (1) portions of Keefe and Cole's reply to his objection to their motion to dismiss, doc. no. 36, and (2) Exhibit A to the WestBridge defendants' motion to dismiss, doc. no. 34-2. See doc. nos. 41 & 38.

For the reasons explained below, the court denies Keefe and Cole's motion to dismiss and their motion for joinder. The WestBridge defendants' motion to dismiss is denied in its entirety. Woods's motions to strike are denied as moot.[1]

Background[2]

WestBridge is a New Hampshire corporation that provides treatment services for adults with mental illness and substance use disorders. On May 7, 2013, WestBridge hired Woods as a part-time mentor. The remaining defendants, employees of WestBridge, worked with or supervised Woods. Berry worked in various capacities, including CEO. Lucius worked as a Care Manager and Chief of Clinical Services. Keefe worked as WestBridge's acting Human Resources Manager. Cole held various roles at WestBridge including Acceptance and Commitment Therapy Team Leader and Clinical Director.

For the first 18 years of his life, Woods lived through the "Troubles" conflict in the Republic of Ireland. During that time, he lived close to the border between Southern and Northern Ireland. Woods is proficient in a Gaelic dialect and speaks English with an Irish accent. He immigrated to the United States around age 18.

Woods alleges that the defendants subjected him to a pattern of discrimination, retaliation, and hostility while he was employed at WestBridge on account of his Irish national origin, race, ethnicity, and ancestry. The problematic behavior began early in his tenure and culminated in a 2021 leave of absence that effectively ended his employment.

---

[1] Woods also moves for leave to file a late objection to the WestBridge defendants' motion to dismiss. Doc. no. 46. The court grants that motion and has considered the objection in ruling on the WestBridge defendants' motion to dismiss.

[2] The following facts are as alleged in the amended complaint.

2

After joining WestBridge in 2013, Woods enrolled in college with the goal of becoming a Licensed Alcohol and Drug Counselor (LADC) in New Hampshire. The licensure process required Woods to log hours under the supervision of a licensed professional. During his employment at WestBridge, various WestBridge employees supervised Woods for this purpose. Woods alleges that WestBridge employees manipulated the supervision requirement "as a punitive tool to influence the terms and conditions of . . . employment." Doc. no. 29 at 5.

Early in his employment, in 2014 and 2015, Woods experienced a raft of comments related to his Irish nationality and ethnicity. In 2014, Mary Woods, who at times served as WestBridge's CEO, asked Woods to fix the way the window blinds were positioned during a meeting because they looked like "shanty Irish" from the outside. Walker, Woods's supervisor, and Berry, Keefe, and Lucius were present and did not object to Mary's remark. Further, when Keefe gave Woods the keys to the main office he said: "Why do we have keys . . . To keep people honest." Id. at 5. Woods understood this comment to stigmatize "alcoholics (a stereotype about Irish people) [as] being untrustworthy." Id.

Also in 2014, employees at WestBridge wrapped Woods's office chair in tape that looked like the United Kingdom flag (Union Jack tape). When Woods arrived at work, "people were snickering under their breath." Id. at 6.  Woods became visibly upset, and shouted things like: "Who the fuck did this!?"; "What the fuck is this!?"; "What does this mean!?" Lucius was among those present when this incident occurred. Although Woods complained about the offense, nothing was done to remedy it. In Woods's view, "the Union Jack represents British sovereignty and rule over Ireland and surrounding nations, which includes British imperialism, persecution, and the genocide of the Irish through the potato famine." Id. at 7.

In 2015, Mary and Keefe repeatedly told Woods that his "'Irish brain' made him speak up about concerns." Id. at 6. Woods asked Mary and Keefe to stop making such offensive comments, which led to a lunch for the three of them to "talk it through." Mary and Keefe explained their interpretation of "Irish brain" as referring to Woods's temperament and disposition, and Woods explained why it offended him. Id. After the meeting, Mary and Keefe continued to make references to Woods's "Irish brain."

In another 2015 incident, company leadership selected Woods and other members of the team to attend an experiential training in Arizona. As part of the training, the facilitator asked Woods to share personal information regarding his childhood in Ireland, his family history, and his political and religious views. Woods shared how his experiences living through the Troubles shaped him as a person. He felt uncomfortable doing so, but shared out of fear of employment repercussion. He had observed that WestBridge leadership would mistreat employees who opposed them by making their working conditions difficult, "seemingly to compel them to resign." Id. at 8. Upon returning from the leadership training, WestBridge employees, including Keefe and Lucius, asked Woods and the other attendees to share their experiences in Arizona.

Also in 2015, Woods complained to Keefe—who was acting as the Human Resources Manager—about harassment he had suffered from coworkers. Keefe responded that Woods had "resentment." Id. Later, in 2017, a Westbridge employee "verbally abused, harassed, and physically postured himself to attack" Woods. Id. Woods complained to Keefe, who was still the HR Manager, and filed an incident report. In response to the report, Keefe dismissed Woods's experience as "subjective," stating that "when a finger is pointed, remember there are three pointing back." Id. at 9. Keefe took no action against the offending employee. When the employee later left the company, Keefe permitted the former employee to visit the office and

attend a WestBridge event on the basis that the person's family had "spent a lot of money here," so "had a right to be there . . . anytime." Id. Woods complained about Keefe's mishandling of his complaints to leadership, but WestBridge took no action to investigate the abusive employee or Keefe's response.

Also in 2017, WestBridge held an employee training on trauma facilitated by Mary and Lucius. They asked Woods to "commit more and not be so quiet." Id. at 10. Woods felt uncomfortable participating, but shared the same personal information he had shared in 2015 in Arizona, this time with the entire company. Woods sought guidance from WestBridge leadership on how to manage his feelings about sharing his past traumas, but received no support.

In 2018, James Sheldon became Woods's direct supervisor and a team leader. Woods alleges upon information and belief that Sheldon had heard about Woods's past experiences in Ireland through Woods's participation in the trainings. This allegedly led to harassing comments such as repeated remarks like: "There is just something about you that triggers me." Id. at 10. Sheldon also made comments about how Woods could potentially be violent because of his experiences growing up in Ireland. At some point, Sheldon insinuated in front of the team he led that a pregnant employee had a relationship with Woods, saying that her child would "come out with an Irish accent and a beard." Id. Woods complained to leadership, but no investigation occurred and the harassment continued.

At unspecified times, Woods told Lucius about "medication discrepancies" he had found and asked how to rectify them, but Lucius responded: "Oh I don't want to find anything." Id. at 11. This was consistent with Woods's experience of "a steadfast culture of not investigating workplace complaints at" WestBridge. Id.

Around 2018, an unnamed coworker harassed Woods by going to his house and honking from his car at early hours while Woods's young son was trying to sleep. Woods complained repeatedly to HR about the coworker's conduct, and also complained in a 2018 meeting with Lucius, Berry, and Keefe, where he described the emotional distress the harassment caused. Rather than taking any corrective action, the company gave the harassing employee a workplace award shortly after Woods had raised his complaints.

Woods alleges that the defendants' discrimination "sharply increased" when Berry became WestBridge's CEO in 2018. His tenure resulted in a high turnover of human resources professionals. Woods learned from a former HR team member that Berry had told her that Woods "reminds me of me . . . I had to work on my Irish temper too." Id. at 12. Woods continued to suffer offensive comments and alleged "racial slurs." Id. These comments occurred in a gathering area called the "bullpen," where Berry and Keefe could hear everything said. Although one employee was terminated for swearing in the bullpen, Berry and Keefe never intervened when employees made offensive comments about Woods in the same location.

Around March 2020, a conversation occurred in the bullpen about the Irish potato famine. Someone asked, in good faith, why the Irish did not fish to survive. Another employee mockingly, through chuckles, asked: "Yeah, why didn't they just fish?" Id. at 13. Woods responded: "If you make a joke about the Holocaust in the workplace you have a lawsuit, but someone makes a joke about the potato famine and my people dying and it is a big joke." Id. Numerous employees and leadership, including Berry, were present for this incident or heard about it secondhand.

In another incident, WestBridge employees collectively repeated the word "potato" in a mocking manner that Woods and a new employee found disrespectful. Id. Woods alleges that

6

Berry and Keefe either witnessed or heard about both these incidents, and he also complained about them to Lucius, who took no action. Around twenty times throughout his employment, WestBridge employees called Woods "Paddy" or "Mick." Id. Employees said "potato" in a demeaning manner to Woods with the same frequency. Id. The defendants knew about these comments but did nothing to stop them.

Cole transferred to WestBridge's New Hampshire facility around October 2018. He worked closely with Berry. Cole repeatedly demonstrated his willingness to discriminate against women in the workplace. He told Woods about how he "would carry out Berry's directives by making [WestBridge] participants give false information about [WestBridge] employees . . . as a pretext to terminate employment." Id. at 14.

Around 2019, Woods applied for a promotion to an open Team Leader position. He learned that Cole had also applied. Given Cole's close relationship with Berry, Woods anticipated that Cole would get the job, so he withdrew his application. Cole said to Woods: "Irish need not apply, right?" Woods complained about this comment to Lucius, but she only rolled her eyes in response. Cole ultimately received the job.

Also in 2019, Cole allegedly falsified that another employee had complained to HR about Woods, which triggered an investigation. When Woods met with the employee to discuss her complaint, she said she had never complained to HR about him. Woods again complained to Lucius to no avail.

Another incident occurred around February 2020, when in front of the team Cole said to Woods: "You will be rooting for the Irish gypsy this weekend," in reference to an upcoming match featuring an Irish boxer. Around March 2020, media reports surfaced about Conor McGregor, another Irish boxer, having behavioral and substance use problems. In front of the

team, Cole asked Woods when they would get McGregor as a client and stated: "We only have room for one Irish guy in recovery here." Id. at 17. In another incident, Woods told Cole he could not work certain on-call shifts due to family obligations, and Cole replied: "ILM," which he explained meant "Irish lives matter." Another time, in the presence of Berry and other leadership and staff, Cole compared Woods to a former employee who had a "wicked Irish tongue." Id. Woods privately confronted Cole about the statement. Cole apologized for comparing Woods to the former employee "but did not apologize for the racist statement." Id. Woods unsuccessfully complained to Lucius about each of these incidents. At some point, Cole told Woods that Berry had given him permission to "get rid of who you want" and "build your team from the bottom up." Id. at 18.

In 2020, Woods complained to Lucius "for months about Cole's unethical and discriminatory behavior before [WestBridge] took any action." Further:

> Mr. Woods complained to Lucius that Cole was targeting him by trying to instigate him with offensive Irish comments, posturing over him with his hands on Mr. Woods's shoulder, stating that he preferred fighting to resolve problems like when he would "duke it out" during his employment in the sanitation field, following Mr. Woods home, watching his house, insinuating that coworkers were having sexual affairs, and putting Mr. Woods on work schedules that he specifically asked Cole not to work.

Id.

WestBridge ultimately investigated Cole's conduct. Woods alleges that complaints from numerous employees prompted the investigation. The company placed Cole on administrative leave, and his employment ended around October 2020. WestBridge permitted Cole to attend a recovery event after his firing, which caused discomfort amongst employees. Woods complained to Lucius about Cole's attendance at the event, but Berry said that Cole had made a "considerable donation" to WestBridge. Id. at 19.

8

Eventually, Woods alleges, Berry's "conduct and omissions during his tenure as [WestBridge's] CEO[ made it] clear that he wanted to terminate" Woods's employment. Id. Around January 2021, Woods stepped into the role of Team Coordinator on an interim basis. Lucius had explained to Woods that the coordinator position "would fizzle out once they had an ACT Team Leader in place." Id. He could not, however, apply for the Team Leader position because WestBridge "changed the job qualifications to require the applicant to have a master's degree," although the company had not previously required that credential. Id. Woods alleges that WestBridge changed job description because it knew that he did not have a master's degree and the change would render him ineligible. He believes the position was "specifically tailored" to exclude him. Id. at 20.

Woods's interim term as Team Coordinator ended when another employee was promoted to the position on a permanent basis. Woods had heard Berry comment multiple times that the promoted employee "had the right temperament," in reference to Woods's "Irish temperament." Id. Woods believes "temperament" was a "coded reference" to his "'Irish brain' and his national origin, race, ethnicity, and ancestry." Id.

On June 3, 2021, Woods was accused of using an inappropriate "tone" while responding to questions while he was leading an employee training. Id. In response, Woods met with the HR Director. After speaking with Woods, she told him that no further investigation into the incident was necessary. The HR Director told Woods that Berry had yelled at her to "find something" on Woods, but she "told him many times there is nothing to follow up on." Id. at 21. The HR Director confirmed to Woods that Berry wanted him out of the company. Berry had told her that Woods was "yelling" during the training incident, but the HR Director knew that was false and told Berry. According to the HR Director, Woods had been labeled a "complainer" by

9

management. Woods believes this label was in reference to his "voiced concerns about participant care and the discriminatory and retaliatory treatment he suffered because of his national origin, race, ethnicity, and ancestry." Id. Woods asked HR about using an anonymous tip line, but the Director told him not to because the complaint would go to Berry.

A week after Woods met with HR, around August 5, 2021, Woods had a surprise meeting with HR, Lucius, and another employee, who told him he was being sent on a two-day communications training due to the June 3, 2021 "tone" incident. Woods told the group that the training was a "sell out" and "a retaliatory response because of his complaints about Cole." Id. at 22. He also told them that he knew from his prior meeting with the HR Director that "Berry wants me out." Id. Lucius was silent in response. Woods completed the communications training.

Later, at a meeting with Lucius, Berry, and HR, WestBridge demoted Woods from his mentor team leader position and issued a "corrective action" and a final warning for his conduct on June 3, 2021 and August 5, 2021. Berry and Lucius "bullied" Woods during the meeting by repeatedly asking him: "Have you nothing to say?" Id. at 22. Woods "could tell that Berry and Lucius intended to evoke a response . . . to manufacture a termination reason." Id. Woods asked to take the paperwork regarding the corrective action home and give notes to HR later. He also asked how the demotion would affect his salary, but Berry insisted that he "[l]ook at [him]" and give any notes on the spot. Id. at 23. Woods felt pressured to sign the corrective action paperwork, which had "discrepancies and was baseless and retaliatory." Id. Woods did not consent to his demotion, which he alleges on information and belief would materially affect his work duties and hours. The meeting resulted in the first corrective action on his record.

After the meeting, Woods had a nervous breakdown. On August 13, 2021, he emailed HR that, on his doctor's recommendation, he was "requesting a medical leave of absence beginning Monday August 16th due to anxiety and newly diagnosed depression caused directly by [his] work environment, including . . . ongoing harassment." Id. at 24.

On August 16, 2021, Lucius, who was supervising Woods's hours in support of his LADC licensure, abruptly ended Woods's three-year supervision agreement. Westbridge and Lucius had control of the documents related to Woods's supervision hours and Lucius did not produce them to Woods after terminating his supervision. On a prior leave of absence related to a knee surgery around 2018, WestBridge did not revoke or suspend his supervision agreement, in contrast to the events in 2021.

Further, Lucius had promised Woods she would provide him with a letter of recommendation for a master's program. On August 24, 2021, Woods received the letter after the application deadline had closed. Woods did not get accepted to the master's program.

After Woods's leave of absence, WestBridge did not "reintegrate" him into his employment, and instead left him "hovering in employment purgatory, not knowing where he stands, which effectively terminated his employment." Id. at 26. Woods never received any follow-up regarding his August 13, 2021 complaint of harassment.

On May 18, 2022, Woods filed a charge of discrimination with the New Hampshire Commission for Human Rights (NHCHR), which he cross-filed with the EEOC. On January 31, 2024, Woods filed his case with this court. His original complaint alleged claims of discrimination, retaliation, hostile work environment, and constructive discharge under Title VII, the Americans with Disabilities Act (ADA), and the New Hampshire Law Against Discrimination. Woods filed his amended complaint with this court on February 28, 2025,

dropping his ADA and state law claims, and his claims against one of the original defendants. Keefe and Cole move to dismiss Counts IV and V, which allege race discrimination and retaliation under § 1981. Doc. no. 32. The WestBridge defendants move to dismiss the amended complaint in its entirety, doc. no. 34, and Keefe and Cole move to join that motion, doc no. 37.

Standard of Review

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013). To test a complaint's sufficiency, the court must employ a two-step approach. First, it must identify and disregard statements that "merely offer 'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678 (alterations omitted)). Second, the court must credit as true all nonconclusory factual allegations and the reasonable inferences drawn from those allegations. See id. Only then can the court determine whether the "combined allegations, taken as true, . . . state a plausible, not a merely conceivable, case for relief." Id. (quotation omitted).

12

Discussion

Before turning to the arguments raised in the WestBridge defendants' motion to dismiss, the court must address several other outstanding motions.

I.       Keefe and Cole's Motion to Dismiss

In addition to his claims against WestBridge, Woods asserted two claims, Counts IV and V, against Berry, Keefe, Lucius, and Cole as individuals. Those claims are for race discrimination and retaliation in violation of § 1981. In their motion to dismiss, Keefe and Cole argue that § 1981 does not allow claims for individual liability, relying on Fantini v. Salem State College, 557 F.3d 22, 30 (1st Cir. 2009), which dealt with individual liability for employees under Title VII. But as Woods correctly counters in his objection to their motion, although the First Circuit has made clear that there is no individual employee liability under Title VII, it has not extended that holding to § 1981 and has suggested the opposite.  See Alston v. Spiegel, 988 F.3d 564, 572–73 (1st Cir. 2021) (pointing out that a § 1981 claim's deficiencies included its failure to allege that an individual defendant's conduct "impaired" the employment relationship or that the individual "had any influence on the terms and conditions of" the plaintiff's employment or "any role in the enforcement of the contract"). Moreover, in Dalomba v. Simonsen, Judge Barbadoro rejected the defendants' argument that § 1981 does not allow claims against individuals, reasoning that "[a]lthough the First Circuit has not explicitly addressed the issue, at least five circuits have held that § 1981 permits claims for individual liability." No. 15-CV-272-PB, 2016 WL 1257891, at *6 n.7 (D.N.H. Mar. 30, 2016) (collecting cases). This court

13

agrees with Judge Barbadoro and the persuasive authority he cites and therefore denies Keefe and Cole's motion to dismiss.[3] Their argument under <u>Fantini</u> is misplaced.[4]

II.        Keefe and Cole's Motion to Join WestBridge's Motion to Dismiss

Keefe and Cole also move to join the WestBridge defendants' motion to dismiss. Doc. no. 37. Woods objects to the motion on the bases that (1) "Defendants have waived these arguments" and (2) "Defendants offer no articulation of why the factual and legal analysis underlying their co-Defendants' Motion to Dismiss, and Mr. Woods's Objection to same, are applicable to them." Doc. no. 43-1 at 3. The court tends to agree with Woods that Keefe and Cole waived the arguments in the WestBridge defendants' motion when they omitted those

---

[3] Keefe and Cole also argue that Counts IV and V are actually Title VII claims or should be dismissed as "defective." Doc. no. 36. These arguments rely entirely on the references to "§ 1981 et seq" in the headers for the claims. Doc. no. 29 at 30-32.  Keefe and Cole maintain that the inclusion of "et seq" renders the claims Title VII claims, causes an ambiguity, or impermissibly pleads multiple claims in a single count. These arguments are unpersuasive. Keefe and Cole have not explained why Woods would raise separate, explicit Title VII claims for discrimination and retaliation in other counts, while also somehow implying—via only the citation form "et seq"—that the claims brought against the individuals under § 1981 are also, or include, Title VII claims.

[4] The court agrees with Woods that Keefe and Cole have improperly raised arguments in their reply that were not raised in their motion to dismiss. Keefe and Cole's motion to dismiss argued only that § 1981 does not provide for individual liability. Woods's objection properly responded only to that argument. Keefe and Cole's reply, however, argues for the first time that Woods failed to plead sufficient facts to establish a prima facie case for his § 1981 claims against them. But arguments "raised for the first time in reply briefing are considered waived." Planet Fitness Int'l Franchise v. JEG-United, LLC, 633 F. Supp. 3d 484, 501 n.16 (D.N.H. 2022). Further, Local Rule 7.1(e)(1) restricts reply memoranda to "rebuttal of factual and legal arguments raised in the objection or opposition memorandum." Faiella v. Green Tree Servicing LLC, No. 16-CV-088-JD, 2016 WL 3546232, at *3 n.2 (D.N.H. June 23, 2016).
　　　Because the court deems the arguments raised for the first time in Keefe and Cole's reply waived, it denies as moot Woods's motion to strike those portions of the reply. See doc. no. 41; see also Moore v. Wetzel, No. 1:18-CV-1523, 2019 WL 1099003, at *1 (M.D. Pa. Mar. 8, 2019) ("[I]t is generally held that a brief—as opposed to other forms of pleadings—typically will not be considered a 'pleading' which is properly the subject of a motion to strike.").

arguments from their own previously-filed motion to dismiss. See Duro Textiles, LLC v. Sunbelt Corp., 12 F.Supp.3d 221, 225 (D. Mass. 2014) ("The omission of known grounds for dismissal from a motion to dismiss generally amounts to a waiver of dismissal on those grounds." (citing Crispin-Taveras v. Municipality of Carolina, 647 F.3d 1, 7 (1st Cir. 2011))). That waiver is not determinative, however, because the court does not grant the relief requested by the WestBridge defendants in their motion and the court would deny the same relief as to Keefe and Cole even if it granted the motion for joinder. See doc. no. 53 at 1 (requesting the same relief afforded under the WestBridge defendants' motion to dismiss "to the extent the Court grants WestBridge's, Berry's, and [Lucius's] Motion to Dismiss"). Accordingly, the motion for joinder is denied.

III.    Woods's Motion to Strike Exhibit A

In the WestBridge defendants' memorandum in support of their motion to dismiss, they rely on a contract attached to the motion to show that "Lucius was required, per the terms of her professional licensure supervision agreement with [Woods], to report to the New Hampshire Board of Licensing for Alcohol and Other Drug Use Professionals that he was no longer working under her supervision." Doc. no. 34-1 at 4. Woods moves to strike the contract, attached as Exhibit A to the motion to dismiss, doc. no. 34-2, on the basis that it is evidence not properly before the court at this stage. Doc. no. 38. The court need not determine whether the supervision agreement is properly presented with the motion to dismiss because it is not relevant to the motion. Lucius's reporting obligations would be relevant to whether she had legitimate nondiscriminatory reasons for terminating Woods's supervision agreement under the McDonnell Douglas burden-shifting framework, but Woods need only make out a prima facie case to survive the WestBridge defendants' motion to dismiss. See Bhatti v. Trs. of Bos. Univ., 659 F.3d

15

64, 70 (1st Cir. 2011). Accordingly, the court does not consider the terms of the supervision agreement in deciding whether Woods's allegations are sufficient to state a claim. The court thus denies the motion to strike as moot.

IV.     The WestBridge Defendants' Motion to Dismiss

The WestBridge defendants argue that Woods's amended complaint fails to state a plausible claim for relief, but they also raise certain other issues that they claim entitle them to dismissal of one or more of Woods's claims. The court addresses these arguments first before turning to the merits.

A.     Racial Discrimination Under § 1981

The WestBridge defendants argue that Woods's claims under § 1981 "fail for the independent reason that they are based on [Woods's] national origin, rather than his race," and national origin is not a protected characteristic under § 1981. Doc. no. 34-1 at 6. Woods counters that § 1981 defines race broadly enough to permit his claims premised on his "Irish race, his Irish ancestry, and his Irish ethnicity." Doc. no. 39-1 at 2. The court agrees with Woods.

"Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609 (1987) (citing Runyon v. McCrary, 427 U.S. 160, 168, 174–175 (1976)). This includes race-based employment discrimination. See Sinai v. New England Tel. & Tel. Co., 3 F.3d 471, 472 (1st Cir. 1993).

A discrimination claim based on national origin alone is not cognizable under § 1981. Nnadozie v. Genesis HealthCare Corp., 730 F. App'x 151, 157 (4th Cir. 2018); see also Ricci v.

16

Key Bancshares of Maine, Inc., 768 F.2d 456, 467 (1st Cir. 1985) ("[I]t is doubtful that § 1981 provides any protection against discrimination based solely upon national origin."). However, the meaning of race under § 1981 "is much broader than our modern understanding of the term." Nnadozie, 730 F. App'x at 156 (citing Saint Francis Coll., 481 U.S. at 609–13). The Supreme Court has held that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Saint Francis Coll., 481 U.S. at 613. Section 1981 thus "reaches discrimination against an individual 'because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens.'" Id.

Courts have "recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case." Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (citing Sinai, 3 F.3d at 475). The First Circuit has cited with approval Justice Brennan's observation that there is no bright-line between race and national origin discrimination, as they are often "identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group." Sinai, 3 F.3d at 474 (quoting Saint Francis Coll., 481 U.S. at 614 (Brennan, J., concurring)).

As such, "with evidence of some nexus between ethnic or ancestral characteristics and workplace discrimination," a plaintiff may bring a § 1981 claim based on being, for example, "'African' or 'Nigerian,'" "Jewish," "Middle Eastern," or "Iranian." See Nnadozie, 730 F. App'x at 157 (citing Sinai, 3 F.3d at 474–75) (further citations omitted). Indeed, in considering the legislative history of § 1981, the Court in Saint Francis College noted congressional "references to the Scandinavian races . . . as well as the Chinese, . . . Latin, . . . Spanish, . . . and Anglo-Saxon races." 481 U.S. at 612 (citations omitted). The court further emphasized a congressional

statement that the Voting Rights Act of 1870, which is considered a source of legislative history for § 1981, would forbid discrimination "against the immigrant from France in favor of the immigrant from Ireland." Id. at 612–13 (citations omitted); see also Vill. of Freeport v. Barrella, 814 F.3d 594, 605 n.25 (2d Cir. 2016) (indicating that a "a hypothetical white applicant whose ancestry is one-half Hispanic and one-half Irish . . . could, in principle, bring a race-discrimination suit if an employer refuses to hire him because he is Irish-American, and instead hires a white Italian-American).

In Carl v. Western-Southern Life Insurance Co., the court considered a § 1981 claim based on alleged discrimination on account of Irish ancestry. No. CIV.A. 09-3990, 2010 WL 3860432, at *4–5 (E.D. Pa. Sept. 30, 2010). The court noted the Third Circuit's holding that race discrimination "must be based on the plaintiff's 'objective appearance to others, not his subjective feelings about his own ethnicity.'" Id. at *4 (quoting Bennun v. Rutgers State Univ., 941 F.2d 154, 172 (3d Cir. 1991)). Racial discrimination, in the Third Circuit's view, "stems from a reliance on immaterial outward appearances that stereotype an individual with imagined, usually undesirable, characteristics thought to be common to members of the group that shares these superficial traits." Id. The plaintiff in Carl alleged that his supervisor had referred to him as an "Irish rat," but the court reasoned that there were "no factual allegations to suggest Carl possessed any characteristics thought to be common to the Irish 'race.'" Id. at *5. Without such allegations, Carl's complaint failed to state a claim.

Here, by contrast, Woods alleges repeated derogatory comments about his Irish temperament, or "Irish brain." Unlike the "Irish rat" comment, these allegations show the defendants' negative stereotyping "based upon some physiological characteristic." See Ricci v. Key Bancshares of Me., Inc., 768 F.2d 456, 467 (1st Cir. 1985). Giving Woods every reasonable

inference, the comments suggested that because Woods is Irish, his brain is predisposed to a particular temperament. The court recognizes that discrimination based on Irish ancestry or ethnicity is not the sort of racial discrimination we typically contemplate today. But it is cognizable as race discrimination under § 1981 given the Supreme Court's broad definition of race under the statute, which is based on a historical conception of race as centered on "ancestry or ethnic characteristics." Saint Francis Coll., 481 U.S. at 613.

B.       Timeliness

The WestBridge defendants argue that Woods's claims are largely untimely because Title VII requires that a claimant file his charge of discrimination within 300 days of when the charge is filed with the state fair employment practices agency. Further, § 1981 claims must be filed within four years of the unlawful conduct. Accordingly, because Woods filed his charge with the NHCHR on May 18, 2022, the defendants argue that only events that took place after July 22, 2021, are actionable under Title VII. Further, because he filed his amended complaint on February 28, 2025, only events that occurred after February 28, 2021, are actionable under § 1981. Doc. no. 34-1 at 7–8. Woods concedes that the limitations period on his Title VII claims began on July 22, 2021. He argues, however, that his § 1981 claims relate back to the filing of his original complaint, so the limitations period started on January 31, 2020, four years before the filing of his original complaint. Doc. no. 39-1 at 5. Woods is correct.

"An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). The question is whether "the alteration of the original statement is so substantial that it cannot be said that

defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the claim." Frederick v. State of New Hampshire, No. 14-CV-403-SM, 2016 WL 4382692, at *7 (D.N.H. Aug. 16, 2016). "This analysis is directed to conduct rather than causes of action, and new legal theories may relate back to the original filing where there is a shared basis in factual circumstances." Id. (quotations and alterations omitted). Courts have liberally applied relation back pursuant to Rule 15(c).[5] Gold v. Poccia, No. CV 17-104 WES, 2018 WL 4521940, at *2 (D.R.I. Sept. 21, 2018).

Here, Woods alleges new statutory authority for his claims against certain defendants named in his original complaint, but the facts alleged in Woods's amended complaint are nearly identical to those alleged in his original complaint. The original complaint alleged claims of discrimination, retaliation, and hostile work environment, in part, on the bases of national origin and race. Although those claims were brought only under Title VII, and the amended complaint added correlative claims under § 1981, the facts and broad legal theories underlying both complaints are the same. As such, Woods's original complaint gave the defendants "adequate notice" of the factual basis for his § 1981 claims, and the amended complaint did not alter the operative facts in a way that precludes relation-back. Frederick, 2016 WL 4382692, at *7.

Because the relation-back rule applies, the court will consider conduct that occurred as far back as January 31, 2020, in resolving the motion to dismiss Woods's § 1981 claims. Because Woods does not challenge the date for the Title VII claims set forth by the WestBridge

---

[5] The WestBridge defendants argue, without citation, that an amended complaint should not relate back to an earlier complaint for the purpose of the statute of limitations "when there was no excusable basis for the claims not having been brought sooner." Doc. no. 42 at 4-5. The court is not aware of any such restriction in Rule 15(c) or the relevant caselaw.

defendants, the court will consider facts going back to July 22, 2021, with regard to his claims under Title VII.

        C.      <u>Merits</u>

The same legal framework governs the Title VII and § 1981 claims for discrimination, retaliation, and hostile work environment. <u>Bhatti, 659 F.3d at 70</u> (citing <u>Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18–19 (1st Cir. 1999)</u>). Ultimately, Woods will be required to prove his case with direct or indirect evidence of discriminatory animus or causation. <u>Ames v. Ohio Dep't of Youth Servs., 605 U.S. 303, 324–25 (2025)</u>. A case involving indirect evidence will utilize the <u>McDonnell Douglas</u> burden shifting framework. <u>Oliver v. Digital Equipment Corp., 846 F.2d 103, 111 (1st Cir. 1988)</u>. Under that framework, Woods will be required to establish a prima facie case as to each claim to shift the burden to the defendants to show legitimate, nondiscriminatory reasons for the challenged conduct, which will then shift the burden back to Woods to show that the reasons were a pretext. <u>Bhatti, 659 F.3d at 70</u>; <u>see also</u> <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)</u>.

On a motion to dismiss, however, Woods need only satisfy the standard of review applicable at this stage. In other words and as previously noted, he must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal, 556 U.S. at 678</u>. He is not required to plead facts sufficient to establish a prima facie case because the prima facie standard under <u>McDonnell Douglas</u> "is an evidentiary standard, not a pleading standard." <u>Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 718 (1st Cir. 2014)</u>. Nonetheless, "[t]hose elements are part of the background against which a plausibility determination should be made," and "can help a court determine

whether the cumulative effect of the complaint's factual allegations is a plausible claim for relief." Id. (quotations omitted).

The court notes that the WestBridge defendants did not offer separate arguments in favor of dismissal of any claim based on the specific allegations against each individual defendant. Thus, the court will not conduct a defendant-by-defendant analysis of the allegations in support of discrimination and retaliation.

### 1.    Discrimination (Counts I and IV)

"A prima facie case for discrimination based on disparate treatment presents a four-part test: (1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications." Bhatti, 659 F.3d at 70.

The WestBridge defendants argue that Woods's claims fail on the third and fourth prongs because he did not suffer an adverse employment action caused by his Irish nationality and ethnicity.[6] Woods points to multiple adverse employment actions within the limitations period including "not receiving a promotion, actually being demoted, being compelled into a leave of absence, revoking his LADC supervision agreement, and being constructively discharged from his [Westbridge] employment." Doc. no. 39-1 at 11. With regard to causation, he relies on First

---

[6] The WestBridge defendants also maintain that, with regard to his § 1981 claim, Woods is not a member of a protected class. Doc. no. 34-1 at 11. As the court analyzed above, however, Woods alleges that he was singled out on account of his Irish ethnicity, which is cognizable under § 1981. The WestBridge defendants make no contention that Woods is unqualified for his job.

Circuit authority holding that "stereotyping" and "cognitive bias" are prohibited by the relevant statutes. Id. at 16.

### a.    Adverse Employment Action

"To be adverse, an action must materially change the conditions of [the plaintiff's] employ." Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). Material changes include "decreased supervisory authority" as well as "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Id. A material change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 314 (1st Cir. 2016).  "Reassignment with significantly different responsibilities may be actionable." Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) (quotations and alterations omitted).

Here, Woods alleges that he was demoted from his mentor team leader position at some time after the August 5, 2021 meeting at which Berry and others told him that they were sending him to a two-day communications training based on reports that he yelled while leading a training session. The demotion was an adverse employment action that occurred within the limitations period for both Woods's Title VII and § 1981 claims. See Garmon, 844 F.3d at 314.

The WestBridge defendants argue that the demotion is insufficient to allege an adverse employment action because Woods does not adequately allege that it materially changed the conditions of his employment because he made the relevant allegations (that the demotion would affect his job duties and work hours) "on information and belief." See doc. no. 29 at 23. The WestBridge defendants, however, misapprehend the case on which they rely. In Kashdan v.

George Mason Univ., 70 F.4th 694, 701 (4th Cir. 2023), the Fourth Circuit found insufficient the plaintiff's allegations, made on information and belief, that the defendant did not investigate females who violated its policies and punished them less severely than it punished males, because the allegations were speculative and conclusory and not supported by any facts alleged in the complaint. Here, the facts alleged on information and belief are not labels and conclusions or recitals of the elements of the cause of action, but rather specific allegations regarding the changes Woods expected to the terms and conditions of his employment as the result of his demotion. Additionally, Woods alleges that he attempted to ascertain whether the demotion would affect his salary, but Berry refused to answer. It is reasonable to infer that the demotion would affect his salary. It is likewise reasonable to infer that the demotion would affect his discretion with respect to the mentor team and his duties. Whether he can prove that these changes would in fact have occurred or were intended at the time of his demotion is a question for a later day.

At the same meeting, Woods was also issued a "corrective action"—the first he had received in his time at WestBridge—because he yelled while leading the company training session and called the required two-day communications training a "sell out." Doc. no. 29 at 22. Woods alleges that HR and Berry were aware that he did not yell while leading the training. As alleged, this was an "unwarranted negative job evaluation" which could also establish an adverse employment action. Further, Woods alleges that on July 29, 2021, he was passed over for a promotion in favor of someone who "had the right temperament." Id. at 20. This "refusal[] to promote" could also establish a material change in Woods's employment.[7]

---

[7] So too, could WestBridge's alleged "toleration of harassment by other employees." See Garmon, 844 F.3d at 314. Woods alleges that, in 2020 (within the limitations period for § 1981

24

Finally, Woods alleges that the defendants' conduct surrounding the reprimand and demotion drove him to a nervous breakdown such that he took a leave of absence on the advice of his doctor. The court notes that the amended complaint is vague as to how Woods's employment with WestBridge actually came to a close, but it appears that he never returned from his leave of absence. He alleges that the defendants left him "hovering in employment purgatory, not knowing where he stands, which effectively terminated his employment." Doc. no. 29 at 26. Further, the defendants never investigated his complaint about the ongoing harassment that led to his leave of absence. Id. Because Woods was not terminated outright, and instead his employment appears to have fizzled out based on his and WestBridge's mutual inaction, he must rely on a theory of constructive discharge theory to sustain his allegations surrounding the end of his employment. Constructive discharge requires that "the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). The resignation "cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held; rather, the "ultimate test is one of objective reasonableness." Id. In Suarez, the court held that a reasonable employee would not have felt forced to quit where the plaintiff claimed that the defendants "push[ed] him too hard" by forcing him to work overtime and "demeaned him and undermined his effectiveness" by changing his working conditions and relocating staff. Id. at 54–55. Because these changes were "administered even-handedly" to many employees at the company, the plaintiff alleged only an injury to his ego, not enough to establish constructive discharge. Id. at 55.

---

but not for Title VII), he was repeatedly harassed by Cole and complained to management to no avail. Doc. no. 29 at 17–18.

Here, the events leading up to Woods's leave of absence go further than the facts in Suarez. Taking his allegations as true, Woods was berated at multiple meetings and singled out by company leadership who were set on compelling him to resign. Woods's reprimand and demotion followed years of harassment by other employees and management, which WestBridge had failed to abate despite Woods's complaints. Woods's alleged treatment was not "even handed[]," or a mere hit to his ego. Rather, Woods has alleged working conditions "so onerous, abusive, or unpleasant that a reasonable person in [his] position would have felt compelled to resign."[8]

> b.    Caused by a Protected Characteristic

Woods must also show that the adverse employment actions alleged were "caused at least in part by a forbidden type of bias." Burns, 829 F.3d at 12. The WestBridge defendants argue that the court should dismiss the discrimination claims, in part, because Woods has failed to allege that "his position remains open or was filled by a similarly-qualified individual." Doc. no. 34-1 at 16. But that is only one way that a plaintiff can allege a causal connection between his membership in a protected class and the alleged adverse employment action. Stereotyping and subtle cognitive biases may be sufficient to show that an "employee has been treated disparately because of [a protected characteristic]." Burns, 829 F.3d at 13 (quotations omitted). Disparate treatment may be established "regardless of whether the employer consciously intended to base

---

[8] Woods also alleges that Lucius's termination of his supervision agreement during his leave of absence and failure to timely submit his letter of recommendation were adverse employment actions. These developments likely would not have compelled a reasonable person to resign, so may not adequately support Woods's claim of constructive discharge. The termination of Woods's supervision agreement, however, was likely a material change in the conditions of his employment.

26

the adverse employment action on [the characteristic] or simply did so because of unthinking stereotypes or bias." Id. (alterations omitted).

Woods sufficiently alleges that he was demoted because of anti-Irish sentiment. Woods has alleged that the defendants have often associated Irishness with derogatory comments about temperament, such as Berry's statement that he needed "to work on [his] Irish temper," like Woods, Cole's statement about a "wicked Irish tongue," and the repeated references by WestBridge leadership to Woods's "Irish brain." Doc. no. 29 at 6, 12, and 17. Further, Woods has alleged that the defendants have made employment decisions on this basis, supported by Berry's statement that the employee who received the promotion to Team Coordinator "had the right temperament." Id. at 20. It is reasonable to infer that the defendants stereotyped Woods as having a temper that made him unfit for certain roles because he was Irish. The allegedly disproportionate reprimand and demotion Woods received for yelling while leading a training could be explained by subtle anti-Irish bias. So too could the defendants' failure to promote Woods in favor of an employee with "the right temperament."

Because Woods has alleged facts that could support a finding that he suffered various adverse employment actions because he was Irish, his discrimination claim is sufficient to survive the WestBridge defendants' motion to dismiss.

### 2.    Hostile Work Environment (Counts II and VI)

"To make out a prima facie case of a hostile work environment, [a plaintiff] must point to evidence showing, inter alia, that facts and circumstances of her employment viewed objectively were so 'severe,' 'pervasive,' and 'abusive' as to 'alter the conditions' of her job." Bhatti, 659 F.3d at 73 (quoting Vega-Colon v. Wyeth Pharmaceuticals, 625 F.3d 22, 32 (1st Cir. 2010)).

27

However, a "plaintiff need only show that her work environment was severe or that it was pervasive." Roy v. Correct Care Sols., LLC, 914 F.3d 52, 64 (1st Cir. 2019).

Courts consider "several factors, none of which is individually determinative: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Bhatti, 659 F.3d at 73–74. The "'accumulated effect' of behaviors that individually fall short may, taken together, constitute a hostile work environment." Maldonado-Catala v. Municipality of Naranjito, 876 F.3d 1, 12 (1st Cir. 2017). Further, the court is conscious of its role at this stage of the proceedings. "At the motion to dismiss phase in particular, subject to some policing at the outer bounds, the issue of whether harassment was severe or pervasive is commonly one of degree -- both as to severity and pervasiveness -- to be resolved by the trier of fact." Rae v. Woburn Pub. Schs., 113 F.4th 86, 111 (1st Cir. 2024) (quotation omitted).

Here, Woods alleges that WestBridge employees repeatedly and persistently taunted him about his Irish nationality and ethnicity, and management failed to act despite his repeated complaints. The WestBridge defendants argue that the harassment Woods alleges was not severe and pervasive. Doc. no. 34-1 at 9–10. Although each insult might not on its own be severe, taken together a jury could find that the problem was pervasive. Further, the "accumulated effect" of the pattern could support a finding that the hostile environment was severe. Given the frequency of the harassment, the humiliating and isolating nature of the comments, and Woods's repeated unaddressed complaints, the allegations state a claim based on a hostile work environment.

Much of the harassment Woods alleges occurred outside the limitations period, but under the continuing violation doctrine an employee may "seek damages for otherwise time-barred

28

allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001). "Ultimately, whether allegedly discriminatory conduct constituted a single continuing violation is a factual question." Lee v. Maine Pub. Emps. Ret. Sys., No. 1:21-CV-00219-LEW, 2022 WL 612396, at *2 (D. Me. Mar. 2, 2022). Woods has sufficiently included multiple allegations that involve "the same type of employment actions, occurred relatively frequently, or were perpetrated by the same managers," or discriminatory acts that "involved similar subject matter." Id. (quotation omitted). For the purpose of ruling on the motion to dismiss, the court is satisfied that he is "permitted to reach back and rely upon the direct evidence of the discrimination he suffered in support of his claims (e.g., 'Paddy,' 'Mick,' 'Potato,' 'Irish need not apply,' 'Irish gypsy,' 'Irish temperament' 'Shanty Irish,' 'Wicked Irish tongue,' etc.)." Doc. no. 39-1 at 24. While the anti-Irish comments Woods endured began well outside the limitations period, Woods alleges that they culminated in his reprimand and demotion for the yelling incident, which occurred at and after the August 5, 2021 meeting. As already explained, Woods has sufficiently alleged that these decisions were connected to his Irishness.

In sum, Woods has sufficiently alleged a severe and pervasive hostile work environment, and the continuing violation doctrine applies.


### 3.    Retaliation (Counts IV and V)

"To succeed on a retaliation claim, a plaintiff must show that her employer took some objectively and materially adverse action against her because she opposed a practice forbidden by Title VII, such as race discrimination." Bhatti, 659 F.3d at 73.  "[T]he prima facie burden in

this context is not an onerous one." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 26 (1st Cir. 2004).

Here, Woods has alleged that he repeatedly engaged in protected conduct by complaining to management about the discriminatory and hostile treatment he suffered. He argues that company leadership labeled him a "complainer" as a result, which motivated them to "manufacture[] a narrative that [Woods] yelled during a training event to take corrective action against him." Doc. no. 39 at 24. These allegations state a claim that WestBridge retaliated against Woods for complaining about discrimination and hostility in the workplace. As explained above, the demotion and warning Woods received as a result of the alleged retaliation was an adverse employment action. As such, Woods has met his low burden to show a prima facie case of retaliation at the motion to dismiss stage.

## Conclusion

For the reasons explained above, the court grants Woods's motion to file a late objection (doc. no. 46) and denies WestBridge, Berry, and Lucius's motion to dismiss (doc. no. 34). The court further denies Keefe and Cole's motion to dismiss (doc. no. 32). Keefe and Cole's motion to join WestBridge, Berry, and Lucius's motion to dismiss (doc. no. 37) is denied. Woods's motions to strike (1) portions of Keefe and Cole's reply to their motion to dismiss (doc. no. 41) and (2) Exhibit A to WestBridge, Berry, and Lucius's motion to dismiss (doc. no. 38) are denied as moot.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

March 31, 2026
cc:      Counsel of record.

30